## GRAFTON.

### JOHNSON v. CONANT & a.

In 1835 the plaintiff entered into possession of a nail-factory building, under a deed which he claimed gave him title to the whole of a certain plot of ground on which the building stood, lying north of a grist-mill in Bath, and in 1837 rented it for six months, when it was carried away by a freshet and was never rebuilt. The legal title to the plot, at the time of his entry, was in the owners of the grist-mill. From 1835 to 1880 the plaintiff claimed to be the sole owner of the plot, and for a portion of that time rented water-power which he claimed as appurtenant thereto. The plaintiff's claim was known to and acquiesced in by the successive owners of the grist-mill, no one of whom ever made any claim to land north of the grist-mill building. But in clearing out the rack they were accustomed to throw *débris*

upon the plot; and two of them, in rebuilding the flume after a freshet, threw the *débris* of the old flume upon it.  It being found by a referee that the plaintiff had acquired title by adverse possession, if competent upon the facts to so find—*Held*, that the plaintiff had not gained title by adverse possession.

In 1870, the plaintiff, being one half owner of the grist-mill, conveyed his interest to the defendants' grantors, who then owned the other half, and in his deed bounded the premises by the north line of the grist-mill building.  Afterwards, the defendants, without permission of the plaintiff, enlarged the flume across the common land, and in so doing built a thick wall of solid masonry, and increased the width of the water-way thereon; and it was found by a referee that this appropriation of the common land by the defendants amounted to an ouster of the plaintiff.  *Held*, that the defendants were not liable to the plaintiff in an action of trespass *qu. cl.*, it appearing that the plaintiff had a subsequent right to take water from the flume.

The plaintiff being owner of a blacksmith-shop plot, and a right to use water there to be taken from a certain flume, gained by prescription the right to have water from some of the wheels in the shop pass off into the river to the west, under the flume, while the water from other wheels by right passed out under the grist-mill, south of the shop, of which he owned one undivided half.  Afterwards, in a deed of his half of the grist-mill, the plaintiff reserved "a right of sluice or water-course under the grist-mill for the water privilege north of said mill." *Held*, that the effect of this deed was to extinguish the plaintiff's right to have a discharge of water from the blacksmith-shop privilege under the flume, although there was never any intention on his part to abandon that easement.

TRESPASS *qu. cl.*  Facts found by a referee.  Three actions brought by the plaintiff were tried together.  Such of the facts as are given in the opinion of the court are omitted here.

The premises described in the declaration were situated in Bath, on the easterly side of the eastern branch of the Ammonoosuc river, south of the bridge and north of the pulp-mill now occupied by the defendants.  The westerly side of the premises, next the river, consists of a ledge of rocks called during the trial "the nail-factory plot," and so styled in this report for convenience only.  Near the centre of the premises is a flume, conducting water from the dam across the eastern branch of the river to the wheels of the pulp-mill.  The flume has now on the west side a wall of solid masonry from the pulp-mill to the bulkhead, and also a similar wall extending from the bulkhead towards the dam.  The easterly side of the flume is plank, with a stone foundation.  The premises east of the flume consist of a tract with the remains of an old

cellar on it, known as "the blacksmith-shop plot." The alleged trespass consists of certain acts done by the defendants in enlarging and changing the flume and the walls of the same.

There was formerly a grist-mill directly south of the above premises, and a woollen factory south of the grist-mill. The defendants' pulp-mill occupies the site of the grist-mill and the woollen factory. From or before 1815, and until 1838, there was a building on the west side of the flume, originally used for a nail-factory, and afterwards for cutting dyewood, the occupants taking water from the flume. From an early date until 1855 there was a blacksmith-shop on the east side of the flume, taking water therefrom. The water from some of the wheels in the blacksmith-shop passed out through a race-way under the grist-mill. The water from the wheels on the westerly side of the blacksmith-shop passed out into the river under the flume, near the southerly end of it. The plaintiff has now acquired title to the blacksmith-shop plot under the grantees of Bartlett & Thomas.

December 20, 1842, the plaintiff acquired title to one fourth, undivided, of the grist-mill premises, and, April 1, 1850, to another one fourth,—his title being derived from the heirs of Richard Gookin. January 5, 1870, the plaintiff conveyed to Rand & Cummings his one half of the grist-mill by the following description: "One equal undivided half of a certain plot of land, being part of lot number eleven, in the first range of hundred-acre lots east of Ammonoosuc river, in Bath, having a brick grist-mill standing thereon, butted and bounded as follows, to wit,—beginning at the north-west corner of said mill, thence running easterly by said mill to the north-east corner of same; thence on the same course about seventy-five feet, to the stone wall in the bank; thence turning southerly and running forty feet, to a stake and stones in this wall; thence turning and running westerly to the south-east corner of said mill; thence on the same course by the mill to the south-west corner of said mill; thence on the same course to the centre of the river; thence turning at right angles and running up the river forty feet; thence turning at right angles and running to the bound begun at; with the right of road and passage-way from said mill to the road leading over the bridge, and with the first right of water-power in the easterly side of the river, from the eastern branch or half of the river, sufficient to drive three runs of stone, smut-mill, corn-cracker, and all other necessary and proper machinery for said grist-mill, as now used in the same, with a proportionate right of the flume from the south end of the grist-mill to the dam, and a proportionate right in the dam from the eastern shore of the river to Rock island, subject to one half of the expense of maintaining and supporting said flume and said dam, reserving and excepting the right of a flume under the grist-mill, and the right to take water from said flume to the machinery below, and also reserving a right of sluiceway or water-course under the grist-

mill for the water privilege north of said mill, and also reserving the right of way over said grist-mill plot for the benefit of the privilege below; it being understood that the south-end wall of said mill is to be used in common for said grist-mill, and for any building that may be erected on the old factory plot, in the same manner as it has heretofore been used."

January 14, 1880, Rand & Cummings, having previously acquired title to the other half of the grist-mill, derived from Warren D. Gookin by deeds, all of which referred for description to the deed of 1815, from Sargent to Richard Gookin, conveyed the whole premises to the defendant, Caroline M. Conant, referring for description to the deeds under which they held.

Johnson, upon receipt of the quitclaim deed from W. D. Gookin of October 23, 1835, called the blanket deed, and ever since, until the present controversy, claimed that the quitclaim deed conveyed to him the entire nail-factory plot, meaning all the ledge situated north of the grist-mill west of the old flume, and south and east of the river. He entered under his deed, claiming title to the whole of the above described premises.

It did not appear that Johnson actually set his foot upon the nail-factory plot, or did any act upon that plot which would be an assertion of ownership to it, until the renting of the nail-factory building to Ladd & Thompson, in 1837, as hereinafter mentioned.

Johnson's claim to own the entire nail-factory plot was made known to the various successive owners of the grist-mill up to 1880, and was acquiesced in by all those owners.

In 1837 Johnson rented the nail-factory building to Ladd & Thompson for six months ending January 31, 1838, and received rent therefor. From November 15, 1839, to July, 1855, Johnson rented to the occupants of a machine-shop in the upper story of the grist-mill the right to use in the machine-shop the water which he claimed that he was entitled to use on the nail-factory plot. The other owners of the grist-mill were aware that Johnson had thus assumed to rent "the nail-factory water," and they made no objection, nor any claim to share the rent paid. The nail-factory building was carried off by a freshet in 1838, and there has been no building on that plot since that time. Johnson has continued to claim to be the owner of the plot, and this claim has never been disputed until 1880; but he has not made any use of the plot, nor occupied it in any way, except by renting the water up to 1855, as above stated.

If upon the foregoing facts it is competent to so find, the referee finds that Johnson has acquired title by adverse possession to the nail-factory plot, as against cotenants as well as against all other parties.

A portion of the foundation wall of what was called "the new grist-mill" is still standing north-east of the present pulp-mill This wall is the north line of the grist-mill plot where it abuts

upon the blacksmith-shop plot.    The wall thus now standing, if
projected westerly to the river, would mark the northerly limit to
which the grist-mill owners have occupied or claimed since 1835,
as against the nail-factory plot.    From 1835 to 1880 the grist-mill
owners have never occupied the nail-factory plot, except when
repairing the flume, and when blasting out a way for waste water,
as hereinafter described.    In clearing out the rack, the mill-owners
were accustomed to throw the *débris* upon the nail-factory plot;
and Hodge and Lang, when they rebuilt the flume after the freshet
in 1855, threw the *débris* of the old flume upon that plot.

The old flume, as it existed before 1880, never exceeded eight
feet four inches in width across the water inside the planking.
Between January 14, 1880, and February 16, 1883, the defendants
rebuilt and enlarged the flume, and raised the dam eight inches.
The western bulkhead was moved down about four feet.    The
points of the ledge on each side above the old bulkheads were
blasted out, six feet sawed off from the logs on the east end of the
dam, and the wall extending from the westerly bulkhead towards
the dam was moved somewhat to the westward.    The width of the
new flume at any point between the bulkheads and the rack, as
measured across the water inside the walls, is nowhere less than
sixteen feet four inches.    All that part of the new flume and wall
which is south of the western bulkhead and west of that line is on
the nail-factory plot.    The water-way of the new flume extends
westerly at least six feet beyond the above line, and the top of the
new solid wall extends at least six feet further west than the
water-way.

The bottom of the old flume at the southerly end next the rack
rested upon timbers.    It was not less than a foot and a half
higher than the top of the ledge; and the timbers were so laid
that there was ample opportunity for water from the westerly side
of the blacksmith-shop plot to flow off under the flume into the
river.    For more than twenty years prior to December 20, 1842,
and so long as the shop was used (*i. e.*, until 1854), the water from
the wheels on the westerly side passed off in this way under the
flume.    The water from the other wheels passed off through a
sluice-way under the grist-mill, and might now pass off in that way
under the pulp-mill.    The new flume has been deepened down to
the rock, and a solid foundation wall built under the planking on
the easterly side.    The water from the blacksmith-shop plot cannot
now pass out under the flume.

The referee finds that the owners of the blacksmith-shop plot
acquired an easement, a right to have the water from the wheels
on the westerly side pass off under the flume.    He finds that there
has been no intention on the part of the owners to abandon this
easement during the time the plot has been unoccupied.    He also
finds that this right still exists, unless the court are of opinion
that, upon the facts herein stated as to non-user, and as to the

ownership of the grist-mill, the right has been legally extinguished. The plaintiff has never, either expressly or impliedly, licensed the defendants to do any of the acts complained of.

For purposes of occupation and use by the plaintiff, the nail-factory plot is of no value. The ledge is not capable of profitable cultivation; nor can the plaintiff profitably occupy it with a building containing machinery to be operated by water-power. But its use is of some value to the defendants. It is a matter of pecuniary advantage, though not of necessity, to the defendants to occupy part of the plaintiff's premises with their new flume. In the opinion of the referee, the fact that no user or interference of this kind can lawfully take place without the plaintiff's consent, and without a bargain with him, "gives his interest in this land, even in a pecuniary point of view, precisely the value which that power of veto upon its use creates, when such use is to any other person desirable, and an object sought to be obtained." The value of the nail-factory plot in this point of view is estimated by the referee at $350. The defendants have been using as their own that which was really part of the plaintiff's property, and making a profit of it. As the defendants have derived benefit from the tortious use of the plaintiff's premises, the plaintiff is believed to be entitled to damages measured by the benefit to the defendants. The benefit thus received by the defendants up to the date of the writ is estimated at $25, and the plaintiff's damages on account of trespasses on the nail-factory plot are assessed at that sum. If the plaintiff is held not to be the sole owner of the nail-factory plot, but only a tenant in common of the same, then the above assessments of $350 and $25 should be proportionally reduced.

The referee found for the plaintiff, and awarded damages. The court ordered judgment on the report, and the defendants excepted.

*Bingham, Aldrich & Remich,* for the plaintiff. August 21, 1811, Roger Sargent conveyed to Bartlett and Thomas, through whom the plaintiff claims title, the blacksmith-shop plot, "with the privilege to draw water from the flume adjoining said plot sufficient to supply all wheels necessary for one forge-hammer, two trip-hammers, and bellows-wheels for the same, also one nail-machine and two turning-lathes." This water privilege was granted subject only to the right to draw water from the flume sufficient for a grist- or corn-mill privilege. From 1811 to 1855 this privilege was used in connection with the blacksmith-shop, and "the water from the wheels on the westerly side of the shop passed out into the river under the flume." This shows forty-four years user by the owners of the blacksmith-shop plot, of the right to discharge the waste water under the flume, which fully sustains the finding of the referee "that the owners of the blacksmith-shop plot acquired an easement, a right to have the water from the wheels on the westerly side pass off under the flume." We are unable to see how this finding of the referee can be disturbed by the court.

The referee finds that the acts done on the nail-factory plot by the defendants "constitute an unjustifiable invasion, even if he is held to be a tenant in common with Caroline M. Conant." This finding is fully sustained by the authorities. "One tenant in common may maintain trespass *quare clausum* against his cotenant when there has been an actual ouster, and it will be an ouster if one build buildings or any permanent structure on the common property for his own use." *Bennett* v. *Clemence*, 6 Allen 10; *Odiorne* v. *Lyford*, 9 N. H. 502; *Great Falls Co.* v. *Worster*, 15 N. H. 460; *Prescott* v. *Nevers*, 4 Mason 326; *Stedman* v. *Smith*, 8 E. & B. 2; *Hines* v. *Robinson*, 57 Me. 324; *Silloway* v. *Brown*, 12 Allen 30; *Thompson* v. *Gerrish*, 57 N. H. 85.

(Counsel here discussed at length the state of the plaintiff's title by deed.)

But if the plaintiff's paper title should be held to be insufficient, that he has acquired title by adverse possession seems too clear for argument. The case shows that he has been in the open, visible, continuous, exclusive, and peaceable possession of the nail-factory plot under a claim of right from 1835 to 1880, a period of forty-five years, and that said possession has been with the full knowledge of the owners of the grist-mill plot, and has been uninterrupted and acquiesced in by them for that time. If this does not give title by adverse possession, and fully warrant the findings of the referee, then we are at a loss to know what can. During all of this time Johnson has made such use of the property as its character and situation would admit of, and the purposes for which it was adapted. Sedgwick & Wait on Trial of Title to Land, *s.* 733; *Bowen* v. *Guild*, 130 Mass. 123. The law seems to be that "in determining the sufficiency of an adverse possession, much depends on the character and situation of the land, and the purposes to which it is adapted and for which it is used; and so much depends upon this and the uses to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule. But the jury may take into consideration its nature and situation, and the possession must be by acts suitable to the character of the land. *Coleman* v. *Billings*, 89 Ill. 183; *Ewing* v. *Burnet*, 11 Pet. 53; *Turner* v. *Hall*, 60 Mo. 271; *Draper* v. *Shoot*, 25 Mo. 203; *Leeper* v. *Baker*, 68 Mo. 407; *Bell* v. *Denson*, 56 Ala. 449; *Brumagim* v. *Bradshaw*, 39 Cal. 24; *Creech* v. *Jones*, 5 Sneed (Tenn.) 631–635.

In *Ewing* v. *Burnet*, the court say,—"Neither actual occupation, cultivation, or residence are necessary to constitute actual possession, when the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the party has been evidenced by public acts of ownership such as he would exercise over property claimed in his own right. * * Whether this was the situation of the lot in question, or such was the nature of the acts done, was the peculiar province of the jury." "If the determination of the question of adverse possession depended upon

conflicting evidence or inferences of fact to be drawn from the proof, it was the province of the jury to determine it. and it was error to take the case from the jury." *Trustees* v. *Kirk*, 68 N. Y. 465. The evidence was conflicting, and inferences of fact necessarily had to be drawn by the referee. *Anderson* v. *Bock*, 15 How. 329; *Thompson* v. *City of New York*, 3 Sandf. 488; Wells L. & F., '*ss*. 162–182; *Bunce* v. *Bidwell*, 43 Mich. 542; *Blanchard* v. *Moulton*, 63 Me. 434; *Bowen* v. *Guild*, 130 Mass. 121–124; *O'Hara* v. *Richardson*, 46 Penn. St. 385; *Jackson* v. *Joy*, 9 Johns. 102; *Webb* v. *Richardson*, 42 Vt. 466; *Whitney* v. *Powell*, 2 Pinn. 115; *R. R. Co.* v. *Quick*, 61 Penn. St. 328; *Eaton* v. *Jacobs*, 52 Me. 445.

*Bingham, Mitchells & Batchellor*, with whom was *I. W. Drew*, for the defendants. Johnson's deeds grant the mills and their respective water-powers, and the use and improvement of the surplus water, without any restrictions or limitations as to the machinery to be driven at the mills, or as to the use and improvement that may be made of the water. Johnson's grantees are not restricted to the use of the water as it was used at the time of the grant, but may apply it to driving new and different machinery, and they may use all the water-power granted, whether such water had been used before or not. The essence of the thing granted by Johnson was giving to his grantees the right to have driven at the mills granted all the machinery which all the aggregated water-power granted could drive; and if the flume existing at the time of the grant was insufficient to enable the grantees to attain that end, then Johnson also granted, as parcel of the grant, the means to attain that end : he granted the right of widening or otherwise improving the flume to the extent necessary to attain that end. The words in the deed of Johnson to Rand & Cummings, " with a proportionate right of the flume from the south end of the grist-mill to the dam," are not words of restriction or limitation : they are mere words of enumeration, and do not affect the general grant. The wrongs alleged against the defendants are all comprehended in what was done in making improvements on the flume, and if, under Johnson's grants, the defendants had the right to make such improvements, then Johnson has not even got a case supported by strict technicality, which is the only thing the referee finds for him.

The issue between the defendants and the referee, as to the legal construction to be given to Johnson's deeds, is plain. The defendants contend that Johnson, when he granted the mills and the water-power to be used at the mills, granted all the means necessary to bring the water-power to the mills in full force and effect. The referee is of the opinion that Johnson granted no means of carrying the water granted to the mills granted, except what was afforded by the existing flume, as it was not to be widened or improved. This leads to the inquiry, What was the principal thing granted and intended to be granted by Johnson when he made

his deeds? Was it the flume, with so much water and so much of the mills as were necessary to give full effect to the grant of the flume? or, was it the mills with their water-power, and so much flume as was necessary to give full effect to the grant of the mills and their water-power? It seems to us that the answer to these questions must show the error of the referee's view of the law. If Johnson granted a sufficient flume to carry all the water granted, with full effect, it is entirely immaterial whether a rightful improvement of the flume by the grantees affected any easement he would have had under the flume but for his grant, or any right he had in either nail-factory or blacksmith-shop plots. So far as Johnson is concerned, he must be presumed to have granted everything which is granted by the terms of his grant. As to the easement claimed by Johnson under the flume, by prescription, we submit that, under the circumstances stated, no such easement could ever have existed. In his deed of the grist-mill to Rand & Cummings, he made a reservation of a waste-way for water under the grist-mill, for the privilege north of the grist-mill. So we submit that if Johnson ever had such an easement under the flume, he conveyed it away when he deeded to Bancroft and when he deeded to Rand & Cummings, and did not reserve this easement for his waste water, but did reserve a way for his waste water under the grist-mill.

Johnson has no such right in the nail-factory plot as is claimed by him. The case shows that the nail-factory plot, during the whole time from 1815 to the time the grist-mill was removed, was in the use and occupation of the grist-mill owners for all such purposes as such a plot of land could be in the use and occupation of any one. Their flume was upon it, and they had occasion almost daily to go upon it for the purpose of cleaning out and keeping the flume in order. They widened the flume in Richard Gookin's time by extending it westward. They blasted a way across the nail-factory plot westward to the river for the waste water from the flume, while Ross was an owner, subsequently to 1835. In 1853 they built a large wall to protect the flume, eight feet thick at the bottom, and which must have covered the ledge to the westward of the flume almost as far as the defendants' widening of the flume, complained of in this case. In short, the case shows that the grist-mill owners have constantly, without objection, had the use of the nail-factory plot for all purposes for which it could have been of any use to any one. The fact that Johnson, in his deed to Rand & Cummings of his undivided half of the grist-mill plot, bounded the land he conveyed to them by the north line of the grist-mill, did not affect the right of the grist-mill owners, and all others interested in the flume, to use the nail-factory plot as they had been accustomed to use it.

At the December term, 1884, an opinion was rendered, holding that the defendants were entitled to judgment in two of the actions,

and that the plaintiff should have judgment for nominal damages, without costs, in the other.  Whereupon the plaintiff moved for a rehearing.

*W. S. Ladd, Aldrich & Remich,* and *P. Carpenter,* for the plaintiff.  I.  As to that part of the opinion in which the result is worked out that Johnson did not acquire title to the nail-factory plot by adverse possession between 1835 and 1880, some of the material findings of the referee are,—

"Johnson, upon the receipt of the quitclaim deed, and ever since, until the present controversy, claimed that the quitclaim deed conveyed to him the entire nail-factory plot, meaning all the ledge situated north of the grist-mill, west of the old flume, and south and east of the river.  He entered under his deed, claiming title to the whole of the above-described premises."

"Johnson's claim to own the entire nail-factory plot was made known to the various successive owners of the grist-mill up to 1880, and was acquiesced in by all those owners."

"Johnson has continued to claim to be the owner of the plot, and this claim has never been disputed until 1880, but he has not made any use of the plot, nor occupied it in any way, except by renting the water up to 1855, as above stated."

"If on the above facts it is competent to so find, the referee finds that Johnson has acquired title by adverse possession to the nail-factory plot as against cotenants, as well as against all other parties."

The plaintiff contends that a fatal fault, which runs through the whole opinion and which becomes conspicuously manifest at every point where the opinion touches the matter of the plaintiff's adverse possession of the nail-factory plot, is this: In determining the legal effect to be given to acts of the parties, no attention is paid to the understanding and intent with which those acts were done: that vital consideration is wholly lost sight of or ignored.  Without in terms setting aside the finding that Johnson claimed to be the owner of the premises always after the deed of October 23, 1835, down to the day of the trial, or the finding that from 1835 to 1880 all the owners of the grist-mill understood and acquiesced in this claim of Johnson's, the few and really insignificant acts of the grist-mill owners on the nail-factory plot are given the full effect and more than the full just effect they would be entitled to, in case those owners had all the time been disputing and challenging Johnson's ownership, and were intending by those acts to assert a right and title in themselves, with the purpose of ousting the disseizor by interrupting his possession, when exactly the reverse was true from beginning to end.

Remembering that it is a fact, which is not to be glossed over or frittered away by any ingenious use of words, that from 1835 to 1880 every owner of the grist-mill understood the north line of the grist-mill premises to be the line of the north wall of the grist-mill

building; remembering also the further fact, that every one of those owners, from first to last, until 1880, knew that Johnson claimed to be the sole absolute owner of all north of that line; remembering also the further fact, that every one of those owners, from first to last, down to 1880, understood Johnson's above claim to be well founded, and gave to it their unquestioning acquiescence,—what is the significance of the acts of the grist-mill owners done on the nail-factory plot? We say the answer to this question is too plain to be mistaken, and vastly too important to be ignored; in fact, that it is conclusive upon this branch of the case. Those acts amount to nothing more than would the acts of any one of two adjoining owners upon the land of the other, done without the slightest claim or pretence of right in or to the other's land. It is confidently submitted, that by no distortion of the findings of the referee can it be said that the acts of the grist-mill owners on the nail-factory plot were done under any claim or pretence of right, or for the purpose or with the intention of ousting the disseizor (conceding that Johnson is to be regarded as a disseizor), or to interrupt his possession. Nobody thought of such a thing or intended such a thing. The report shows conclusively that every act done on the nail-factory plot by the grist-mill owners from 1835 to 1880 was done by the leave and license of Johnson, and was so understood by them, because they were all the time acquiescent in Johnson's claim of ownership of that plot; and we say that this recognition of Johnson's right, so far as the owners of the grist-mill were concerned, was equivalent in every legal view to the most complete and perfect *pedis possessio* by Johnson of the entire plot; and it is only by a complete overturning of the principles and doctrines of the law, which have always been applied in settling the only title to land which rests upon the basis of original, natural right, that a different result can be reached.

When making repairs on the flume, or clearing the rack, the same as at all other times during the forty-five years, the grist-mill owners understood and believed that they owned only to the north wall of the grist-mill building. They understood and believed that Johnson was the sole and absolute owner of all north, except the flume itself. They never thought or intended by the act of repairing, or by any other act or word, to dispute his ownership or question the validity of his title. What, then, do the matters of repairing the flume and clearing the rack signify? One man has a right in a water-way or flume running along the margin of another man's land. When he goes on to make repairs of the flume, he finds it convenient to lay his tools and materials temporarily on the contiguous land, which happens to be so situated that it will receive no detriment therefrom. He uses the land for his convenience in that way, either with or without asking the express leave of the owner, but without any idea of thereby expressing or setting up a claim of right in himself to the land, because he has no idea

that he has any such right. Where is the law to be found which says he thereby gets any right whatever in the land so used? Where is the law which says such act amounts to an ouster or interruption of the possession, either of a disseizor or person in possession under any claim of right, whether such claim be well founded or ill founded? The plaintiff says such a legal proposition is new—never before heard of in the common-law world; that it is not the law, and cannot stand.

One thing more is to be said about these acts of the grist-mill owners on the nail-factory plot. If it were possible that they could be held to establish any right against Johnson, by what kind of reasoning can it be said that they establish a right to do other and different things thereon? If I have thrown *débris* from my rack upon my neighbor's land so long, so constantly, and under such a claim of right to do so that the use has ripened into a right, where is the law which says I may therefore make an absolute appropriation of the land to my own exclusive use for any purpose which my convenience or interest may dictate? that I may convert it into a mill-pond or a water-way, or build thereon a pulp-mill, or a solid wall of cemented masonry, eight feet thick? The same is to be said of repairing the flume, building the wall west of it by Johnson, and the myth of support for the flume.

To reinforce the argument thus drawn in the opinion from the acts of the grist-mill owners on the nail-factory plot, during the half century it was in the open, notorious, unchallenged possession of the plaintiff, some legal propositions are put forth against which the plaintiff protests. It is said, "This conveyance must have been an assertion of title, which destroyed the adverse character of any claim or title of the plaintiff up to that time." The conveyance here spoken of is that from the.heirs of Richard Gookin to Hutchins, made in December, 1838. Bear in mind that Johnson entered under his deed, claiming title to the whole of the nail-factory premises; that a year and a half before the execution of the deeds from Richard Gookin's heirs to Hutchins, Johnson had rented the nail-factory building to Ladd & Thompson, openly claiming that he was the sole owner of the whole plot;—bear in mind, also, that "Johnson's claim to own the entire nail-factory plot was made known to the various successive owners of the grist-mill up to 1880, and acquiesced in by all those owners,"—and what becomes of the proposition that the conveyance of Richard Gookin's heirs to Hutchins had the effect to oust him, or interrupt the continuity of his possession?

If the facts stated by the referee in his report are to be taken as true, the heirs of Richard Gookin, as well as Hutchins, knew and acquiesced in the claim of Johnson that he was the sole owner of the whole nail-factory plot at that very time. Neither had the slightest intention to disturb him. All understood that the deeds conveyed only to the north wall of the grist-mill.

Now we are told that those deeds must have been an assertion of title which destroyed the adverse character of any claim of title by the plaintiff.    A declaration made on the land, in the presence of witnesses, of a claim of ownership, may, perhaps, in some cases, have the effect to reinvest the owner, and possibly sometimes interrupt an adverse holding; but it may be doubted whether it was ever before said that a silent paper, written, not on the land, by a party who in fact makes no claim to the land, must or can have such effect.  The truth is, the proposition will not bear a moment's examination.    It needs no discussion.    The fact that Johnson afterwards succeeded to the title of Hutchins is not of the least significance.   When he took that title, he was claiming the nail-factory plot in the same way as he had claimed it all along, by virtue of his deed from Gookin.   Neither he nor his grantors understood that he was getting any title to that plot from Hutchins ; but all understood that what he was getting was the grist-mill premises, bounded north by the north wall of the grist-mill building.

The plaintiff therefore says that this act of the Gookin heirs and Hutchins, to which he was no party, is, by the opinion, made to speak a language which no one engaged in it intended it should speak; and also, that it is given an effect for which no warrant or authority can be found in the law.

II.  By the deeds referred to in the case, Johnson, December 20, 1842, acquired one fourth, October 11, 1848, one eighth, and April 1, 1850, one eighth, of the grist-mill.   His grantors held by the same title and by the same description as that under which the defendants now claim the other half.   According to the contention of the defendants, and according to the view suggested by the court, Johnson took by those deeds one half the nail-factory plot, the description going back by reference to that in the deed from Sargent to Richard Gookin in 1815.

We have not heard it questioned as yet, that Johnson, in his deed of one half the grist-mill to Rand & Cummings of January 5, 1870, did succeed in drawing the line at the north wall of the grist-mill building.   That left him, according to the contention of the defendants (stated as broadly for them as they can state it for themselves), tenant in common with Rand & Cummings of the whole premises lying north of the north line of the grist-mill building.   So that, according to the defendants' claim, Johnson has been tenant in common with the grist-mill owners of the nail-factory plot from December 20, 1842, to the present time.

The referee "finds that these acts [the widening of the flume, etc.] constituted an unjustifiable invasion of the nail-factory plot, and were such as to entitle the plaintiff to maintain this action, even if he is held to be a tenant in common with Caroline M. Conant."   What is to be done with this finding?

The only question of law, and the only possible question for the

court upon this point, is, whether the absolute appropriation of a strip of the common land, eight feet wide, for a water-way, and the absolute appropriation of another strip by the side of the water-way, eight feet wide, by building thereon a solid wall of masonry of that thickness, is evidence from which a jury might lawfully find an ouster of the cotenant as to the land thus taken. Upon the facts stated, is not Johnson excluded from it? Will the learned counsel for the defendants tell us what one tenant in common could do upon the common land, what use he could make of it, what method of exclusion of his cotenant he could adopt, which would amount to an ouster, if this does not? One tenant in common is not authorized to exclude another from the possession of land owned in common. *Odiorne* v. *Lyford*, 9 N. H. 502, 511. If one cotenant excludes another, the latter may have an action. *Great Falls Co.* v. *Worster*, 15 N. H. 412, 460. A tenant in common may be disseized by his cotenant's actually ousting him, or holding him out of possession under a claim of exclusive right of possession, and a denial of the right of the tenant. 1 Washb. R. P. (3d ed.) 566. To which proposition a large number of cases are cited. A demand of possession by one tenant in common, and a refusal by the other, stating that he claimed the whole, is evidence of an actual ouster by his companion. *Doe* v. *Bird*, 11 East 49. The history of the vigorous struggle of the defendants to maintain their claim to the exclusive occupation of this strip of land, against the demands and protests of the plaintiff, was all shown before the referee, and furnished the most abundant ground for his finding, on the authority of this case, as well as numberless other cases of the same tenor which might be cited, even if there were no other ground on which the finding could be sustained. One tenant in common has no right to enter upon his cotenant and oust him of his possession. If he do so, trespass *quare clausum fregit* lies for the injury. *Erwin* v. *Olmsted*, 7 Cow. 229; *McGill* v. *Ash*, 7 Penn. St. 397; *Booth* v. *Adams*, 11 Vt. 156. An exclusive appropriation by one tenant in common of a part of the land, by the erection of a permanent structure, is evidence of an ouster of his cotenant for which trespass will lie. *Bennett* v. *Clemence*, 6 Allen 18.

In *Stedman* v. *Smith*, 8 E. & B. 1, the plaintiff and defendant were tenants in common of a wall which divided their adjoining premises. The defendant let a stone into the wall, with an inscription on it stating that the wall and the land on which it stood belonged to him; and it was held that this was evidence upon which the jury might find an ouster, and that trespass *qu. cl.* would lie. Were the acts of these defendants, in widening the water-way and building a solid, permanent wall eight feet thick, wholly on the common land and wholly for their own exclusive use, any weaker evidence of a claim of sole ownership than the putting up of a notice of such claim on the wall? In the case cited, the wall

had been built long before, and the only evidence of an ouster was the putting up of the notice on it.

Were the acts described in *Wood* v. *Griffin*, 46 N. H. 230, which the court say "clearly constitute an ouster," any stronger or more unequivocal than those complained of here? "When one tenant in common enters into the possession, claiming the whole title, it will in law be an ouster of the other tenant, and trespass *qu. cl.* may be maintained." *Thompson* v. *Gerrish*, 57 N. H. 85. "Trespass *quare clausum fregit* lies by one of several tenants in common against his cotenant, where there has been an actual expulsion." *Murray* v. *Hall*, 7 C. B. 441. The referee found that there was an actual expulsion here. We should like to know upon what evidence the court are expected to say there was not. If the erection of a permanent wall eight feet thick, and the introduction of a deep and permanent stream of water eight feet wide, along side of it, by one tenant in common upon the common land, for his sole use, to the total and absolute exclusion of his cotenant, is to be put entirely one side, insomuch that the court will say it is no evidence upon which a referee can lawfully find an ouster, what is to be done with the cases referred to above, and many more of the same sort which might be added if a multiplication of authorities would add anything to the strength of the position? The question is of the legal possibility of an ouster, under any circumstances consistent with those stated in the report. *Rogers* v. *Bank*, 63 N. H. 428.

A rather faint attempt was made at the trial before the referee to meet this point, by the suggestion that a tenant in common cannot, as against his cotenants, convey his interest in a portion of the common land by metes and bounds, and, therefore, that Johnson's deed to Rand & Cummings did not effect any severance. The answer to this lies so near the surface that this point will not probably be insisted on here. The one answer which makes it unnecessary to go further is, that at the time that deed was made, Rand & Cummings were the owners of the other half of the premises, having derived their title from Lang and Hibbard, March 15, 1869, eight or nine months before they bought of Johnson. That Rand & Cummings, being the plaintiff's cotenants, were the only persons who could object to a severance of the plaintiff's interest in the premises, is not to be denied. Could not these cotenants, who together owned the whole premises, deal with them as they chose? Could they not agree together that one of them should become sole owner of part of the premises to a given defined line, and that they should continue to own together beyond that line? And could they not execute together such papers as would furnish legal evidence of their agreement as to their future ownership? Rand & Cummings might not choose to buy out Johnson as to the whole, and so become sole owners themselves of the whole. In fact, they did not choose to do so. The price paid was presumably

fixed with reference to what they did buy, and not with reference to what they did not buy. Has the court power to compel them to buy what they chose not to buy? Has the court power to say they did buy what the deed shows they did not buy? How, then, do the defendants stand? By the deed of Rand & Cummings to them they took what Rand & Cummings owned, and not what they did not own. The severance had been made by the mutual consent and act of all the common owners long before the defendants came upon the ground. They took the title in the condition in which they found it, that is, with Johnson's tenancy in common of all lying north of the north line of the grist-mill building entirely and absolutely severed from the title which they acquired in the grist-mill premises from Rand & Cummings.

III. " The referee finds that the owners of the blacksmith-shop plot acquired an easement, a right to have the water from the wheels on the westerly side pass off under the flume. He finds that there has been no intention on the part of the owners to abandon this easement during the time the plot has been unoccupied. · He also finds that this right still exists, unless the court are of opinion that, upon the facts herein stated as to non-user, and as to the ownership of the grist-mill, the right has been legally extinguished." This easement is disposed of in the opinion of the court, upon the ground that the sluice-way under the grist-mill, reserved in the plaintiff's deed to Rand & Cummings, "must be taken to be a substitute for the easement before enjoyed beneath the flume." With entire respect it is now submitted that this will not bear examination. It may be assumed that the court has not the power, any more than the disposition, to compel a man to accept one piece of property or one right, in place of and as a substitute for another piece of property or right. If a sluice-way under the grist-mill was ever substituted for the sluice-way under the flume, it was done by act or agreement of the parties. In no other way could it be done. In no other way can it now be done.

" The water from some of the wheels in the blacksmith-shop passed out through a race-way under the grist-mill. The water from the wheels on the westerly side of the blacksmith-shop passed out into the river under the flume, near the southerly end of it."

With the above facts in mind, how can it be justly or truly said that the reservation of a "right of sluice-way or watercourse under the grist-mill" in the plaintiff's deed to Rand & Cummings has any, the least, tendency to show a substitution by the parties of the sluice-way thus reserved, which had always existed and been used there, for another passage-way for water from other wheels in the blacksmith-shop which had also always existed and been used in another place for those wheels? And especially how can any such effect be given to that reservation, when it appears, and is expressly found by the referee, that Rand & Cummings, as well

as all other owners of the grist-mill, understood that they took nothing north of the north wall of the grist-mill except a right in the flume? How can it be said that a substitution was effected in that way by the parties, when it is certain that no thought of such substitution was ever in the mind of either party to the transaction? A man has two ways leading from his store-house, one from a door on the south, and one from a door on the west. He conveys land on the south over which the way coming to that door passes, and in the deed reserves the right of passage over that way: by what process of reasoning is the conclusion reached that he thereby gives up to the grantee his way leading from the west door, and that a substitution is thereby made of one way leading to the south for the two theretofore existing ways? As well might you say that a man who has two steam-engines, one of which is in use in one mill and the other in another mill, by a reservation of the engine upon a conveyance of the first mill makes over to the grantee the other engine, or that the reservation of one horse out of a pair, in a trade between two men about horses, has the legal effect to convey the other not reserved.

But it is said "the reservation of the easement for a sluice-way under the grist-mill, being a sufficient one for all the water reserved for use at the blacksmith-shop land, must be taken to be a substitute," &c.; and again, "a sufficient sluice-way having been provided" Whence is this fact of the sufficiency of the sluice-way under the grist-mill derived? The plaintiff is not able to find any such fact in the report; and if the absence of any such finding by the referee does not afford him protection against its being assumed to his detriment in making a final disposition of the case, he humbly submits that he ought to be granted the privilege of having his evidence on that point heard by the court before the decision is made. The fact assumed is not true; and the right to have water from the west wheels pass off under the flume always existed and was always used, alongside the right to have water from the other wheels pass off under the grist-mill. But even if it were true that the sluice-way under the grist-mill was sufficient for the use of the blacksmith-shop plot, the inference made from that fact cannot stand unless we are prepared to maintain the proposition that a man is not legally entitled to hold and own property which he does not need. A man has two springs of water: one he needs to supply his premises for domestic uses, and it is sufficient for that purpose; the other he does not need. He conveys the land on which the first spring is situated, reserving the right to take water therefrom. Does that reservation tend to show a conveyance of the other spring to the grantee?

It is said that "no use has been made of that passage-way [the one under the flume] for more than twenty-five years." But the only use made of that fact, and the only effect given to it by the court so far as the plaintiff can discover, is the supposed aid it

furnishes to the conclusion that the parties substituted the sluice-way under the mill for the two sluice-ways which existed at the time of the execution of the deed in favor of the blacksmith-shop plot. If the court had said non-user for twenty-five years is conclusive of an abandonment, and as matter of law worked an extinguishment of the easement notwithstanding the contrary intention of the plaintiff found by the referee, we should have a proposition explicit and clear, although possibly somewhat startling. But the court have said no such thing. This fact of non-user is put in the catalogue with certain other matters, all of which are used in a lump to sustain the conclusion that the sluice-way under the mill was substituted for the two existing before. Non-user for a greater or less period of time is, of course, evidence for the jury to consider on the question of abandonment of an easement, but how the non-user of an easement can have any tendency to show the substitution of something else in place of it is very hard for the plaintiff to see. Take the case first supposed, of a man who has two ways to his store-house. For twenty-five years the door on the west side has not been opened, nor the way to it used : how does a reservation of a right of way in his deed of land on the south tend to show an extinguishment of the way on the west,—that is, a substitution of the existing south way not only for itself but for that on the west? It has no such tendency. Words may be framed and put together which shall declare it to be so, but that will not make it so. The truth is the other way.

Moreover, the whole question whether there was a substitution of the water-way under the mill for that under the flume is in its essence and to all intents a question of fact. The referee found no such fact. No such fact was tried before him. No such claim was made by the defendants. The first intimation of such an idea came to the plaintiff in the opinion of the court, and there appears as the sole ground on which one vital part of the case is disposed of. Let it be remarked in this connection, that although the question of substitution was not tried, and there is no direct finding of the fact one way or the other, there is nevertheless a finding which seems necessarily and absolutely to exclude the question of substitution from consideration by the court. The referee says,— " He also finds that this right still exists, unless the court are of opinion that upon the facts herein stated as to non-user and as to the ownership of the grist-mill, the right has been legally extinguished." This is a finding of the existence of the right against all reasons and all facts which may be supposed or suggested, except only the two which are submitted to the court. Let these two things be examined a moment.

(1) For the present, at least, we are content to leave the first point to stand upon this proposition : The question of abandonment is one of intent, and so is matter of fact for the jury. The fact of non-user, whether for a longer or shorter period, is simply

a piece of evidence bearing upon the question of intent. Whether the easement was originally acquired by grant, or by prescription which supposes a grant, the court cannot, from a mere non-user, whether for a long or a short time, declare the easement extinguished, because that question is for the jury to determine upon a view of all the circumstances of each individual case. *A fortiori* the court cannot declare the easement extinguished from the mere fact of non-user, when it appears affirmatively, as in this case, that there was in fact no intention to abandon.

(2) Nothing needs to be said of the other point, except that Johnson was never the sole owner of the grist-mill. If anything in the law can be regarded as certain, it must be certain that in order to effect a loss or extinguishment of an easement by unity of the dominant and servient estates, those estates must come together *in the same proprietor.* The sole reason why an extinguishment takes place in such case is, that no man can have an easement in his own land. We venture the assertion that no case can be found, and no reason can be given in support of the proposition, that the acquiring by the owner of a dominant estate of an undivided interest in the servient estate has the effect to extinguish the easement. The existence and continuance of the easement are entirely consistent with the common ownership, and furnish the only way in which the legal rights and obligations of the parties can be maintained. This makes it unnecessary to insist on the further fact, which is doubtless true in the present case, that even if there had been a merger of the easement while Johnson was owner of an undivided interest in the grist-mill, the character of the easement and the situation of the property were such that upon his conveyance of that interest to Rand & Cummings the easement was revived.

On the above grounds the plaintiff maintains that the judgment which the law pronounces upon the facts stated in the report, as to his easement and right to a passage-way for water from the blacksmith-shop plot to the river across land on which the defendants have constructed their new flume, is in his favor, and he asks no more than that the judgment of the court should coincide with that of the law.

*Bingham, Mitchells & Batchellor,* for the defendants, in reply. We regard the claim of the plaintiff, to hold what is termed in the case the nail-factory plot, as founded upon the most shadowy and intangible evidence that a bold suitor ever dared to present before a court of law. Can it be said that his alleged possession was commenced under even a color of title? Could his grantor, who had no title to one half and no possession thereof, and who excepted out of his deed the other half, have given Johnson any title or color of title? Be that as it may, it is certain that a deed does not give color of title to any more land than it purports to convey.

. The clause in Gookin's deed to Johnson, under which the plaintiff claims in this case, is "the nail-factory privilege," with no words of addition or description. If anything was conveyed by these words, it must have been what was then understood to be the nail-factory privilege. There is nothing in the case, and nothing found by the referee, which shows that what was then understood to be the nail-factory privilege is the land termed in this case, for convenience, the nail-factory plot. All that appears in the case, and all that appeared in the evidence in regard to what the nail-factory privilege was, did not show any particular land or any particular amount of water. The term "nail-factory privilege," so far as it is defined by the report of the referee and so far as it is definable by the evidence in this case, is as unreal, as fleeting and intangible, as the gnomes and sprites that haunted the early Scandinavian navigators.

It appeared from the evidence, that prior to 1835, upon the grist-mill premises, snug up to the west side of the flume, there was a building called the nail-factory, about eighteen by twenty-five feet in size, and containing some machinery run by water, and used in connection with the woollen factory. The ingress and egress to and from this building was from the blacksmith-shop across the flume, so that the only land used in connection with this nail-factory privilege, which was land constituting a part of what is now termed the nail-factory plot, was the land upon which the building aforesaid stood. If this building, with the water used then with the machinery, constituted the nail-factory privilege, then a deed of the nail-factory privilege would convey only the land and water used in connection with that privilege; and as no part of what we term the "nail-factory plot" was used in connection with this nail-factory privilege except the land upon which the building stood, it follows that if we concede Gookin's deed of October 23, 1835, to Johnson to be color of title, it is only color of title to what it purports to convey; and as it cannot be said to purport to convey any more land than was used in connection with the nail-factory privilege, and as only so much of the land in controversy as the buildings stood upon was used in connection with the nail-factory privilege, Johnson would only get color of title to the land covered by the building, a piece of land eighteen by twenty-five feet in size. Now, if Johnson entered upon the whole of what we now call the "nail-factory plot," and had no other claim of title except his deed from Gookin, he would have no color of title to what he entered upon, for the reason that the nail-factory privilege did not embrace the land entered upon.

The particular question in this connection is in regard to what the possession of Johnson was, and what his entry was under the title that we have been considering. This territory which we call "the nail-factory plot" was a part of the grist-mill premises, held by the successive owners under their deeds from the earliest settle-

ment of Bath.   It lay between the mill and the dam, and was of
no earthly use to anybody except to the owners of the grist-mill
and woollen-factory premises.   It was constantly used by the
owners of those mills whenever their mills were in operation, in
looking after the flume and keeping it clear, in rebuilding and
repairing the flume, in making ways across it for discharge of
surplus water from the flume in all times of high water, and in
building structures upon for the purpose of protecting the flume or
enlarging the flume.   This use, as the court or anybody else can
see, was not at long intervals and occasionally, but constant and
uniform from the very necessity of the case.   The grist-mill owners
made this use of the disputed premises the same after 1835 as
before.   The grist-mill owners had the undoubted legal title to
the disputed tract as a part of their grist-mill premises.   The dis-
puted tract was included in the terms of the deeds under which
they held; and they were in possession, claiming all that their
deeds covered, and abandoning nothing, as the report of the referee
shows.   Now, what adverse possession does Johnson show, by vir-
tue of which he is going to get the land in dispute from the un-
doubted legal owners, who have all the time been in constant
possession, exercising full dominion over the property in dispute,
and making the only use of it of which it is susceptible?   It does
not appear, nor does the referee find, that Johnson ever set his
foot upon the disputed tract.   Johnson claims that in 1838 he
rented the building beforementioned, eighteen by twenty-five feet
in size, for six months.   This is the only act that Johnson claims
ever to have done that could have possibly interrupted or inter-
fered with the possession and use of the disputed premises by the
undoubted legal owners of the grist-mill premises.   Such an inter-
ference for the period of only six months, with an abandonment
thereafter of what was merely an old and probably nearly useless
building, did not interfere with the uses which the legal owners
were then making, and always had been making, of the disputed
premises, viz., using it in connection with the flume for rebuilding
and repairing it, for discharging its waste water, and for building
the structures necessary for its protection.

Johnson's temporary invasion and occupation of the old building
simply, could not be regarded as interfering with and upsetting
the title of the legal owners to their land, it not interfering with
the necessary and constant use which the owners were making of
the land.   At the very most, Johnson's occupation of the building
in 1838 for six months only would be no more than a trespass.
Johnson's pretended claims of exercising dominion over this land,
other and beyond the invasion of the building, are wholly without
foundation.   His pretended renting of nail-factory water from 1842
to 1855 was not an act done upon the land in controversy, and had
nothing to do with it.   He (Johnson) says he rented at the grist-
mill, to be used on the grist-mill wheels, or some of them, water

which he called nail-factory water. We think it passes human understanding to conceive how Johnson's renting some water at the grist-mill building out of the Ammonoosuc river and calling it nail-factory water, when he himself at that time was one of the owners of the grist-mill, and also the sole owner of the saw-mill on the western side of the river to which the water of half the river was appurtenant, and which water then was largely unused, could be construed to be an act of adverse possession as against the legal owners of the tract of land in dispute. It becomes apparent that the calling of the water rented by Johnson at the grist-mill nail-factory water is an utter sham, when we look at the record upon Johnson's book, made at the time, on which he kept impersonal accounts. On that book this water thus rented is credited, not to nail-factory, but to saw-mill, showing that Johnson at that time understood that he was renting some of the surplus water belonging to the saw-mill. Johnson at that time owned water appurtenant to the saw-mill which he was not using at the saw-mill, and which he would have a right to rent anywhere else. He did not own any water appurtenant to a nail-factory, nor did anybody else own any water at Bath village at that time known as nail-factory water. It is impossible for the imagination to conceive of anything more groundless than the claim of Johnson that this water rented at the grist-mill had any connection whatever with the land in dispute; so that the claim of Johnson to the land in dispute is unsupported by any legal title acquired by deed, and unsupported by adverse possession against the legal owners, and is made against a party who holds the indisputable legal title, and who has had the possession, actual possession, use, and occupation of the land to the full extent of which it has been susceptible.

Johnson's claim to hold the disputed tract by adverse possession must depend upon the fact whether or not he has had, for the period of twenty years, actual, permanent, and exclusive possession as against the legal owners, whose rights and title the defendants in this case hold. We submit that the holding of the court, that the plaintiff has not acquired title to the disputed premises by adverse possession, is clearly right, and that the plaintiff would have no ground to complain of it if that holding were necessary to a decision of the case.

The third heading of the points and reasons of the plaintiff's motion for a new hearing is as follows, viz., "Upon the holding of the court that one half of the nail-factory plot passed under the plaintiff's deed to Rand & Cummings as an incident to the flume."

The deed of Johnson to Rand & Cummings did convey one half of the flume by that name, and one half of the dam and grist-mill. There can be no doubt that a conveyance of the flume would convey the land on which the flume stood, and all land used in connection with the flume. This is but a plain declaration of a well settled principle of the law, that when a thing is granted, every-

thing incident to the thing granted is also granted. The case shows that the tract in dispute has always been used, and for the last thirty years has been solely and exclusively used, for the purpose of enlarging the flume, and for the purpose of building walls to protect the flume, and for the purpose of blasting out rocks for the making of ways for the waste water of the flume; and it also appears that this disputed tract is of no earthly use or value to anybody only as an incident to the flume. Can there be any doubt that the disputed tract is an incident to the flume, when it has always been used in connection with it, and is not susceptible of any other valuable use? We submit that the plaintiff's counsel have no ground of complaint on account of this holding of the court.

The fourth heading of the plaintiff's motion for a rehearing is this, viz., "Upon the holding of the court that the acts done by the defendants upon the nail-factory plot, as found by the referee, were not of such a character that trespass would lie therefor against a cotenant."

We submit that on the facts found by the referee this holding of the court is right. Each tenant in common has the right to the possession and use of the common property; and when one tenant in common uses the common property by subjecting it to its natural and appropriate uses, it is no ouster of his cotenant. If one tenant in common of a cornfield plant that field with corn, it is no ouster of his cotenant.

The disputed tract is a barren rock pure and simple, over which the waters of the Ammonoosuc river pour with great fury at all times of high water. It cannot be subjected to any use except as a foundation for the erection of some superstructure, or for the purposes of a canal to convey water to some mill. In making the use which the referee in his report says that the defendants have made of the disputed tract, they have made only such use of it as it is adapted to, and the only use to which it is adapted. The report of the referee finds that the only acts of the defendants of which complaints are made is using a part of the disputed tract for a canal to convey water into their mill, and another small part of it to build a wall upon to protect that canal or flume. We submit that the defendants have only made the natural and legitimate use of this property which any tenant in common might make without being guilty of an ouster as against his cotenant. If Mr. Johnson has any water which he wants to run in the canal, let him go and run it if he owns half of the canal. We have done nothing which can prevent any legitimate use by him as cotenant of the disputed tract, if he be a cotenant.

The seventh heading of the points and reasons of the plaintiff's motion for a rehearing is "Upon the holding of the court that the defendants are not liable in any form for the destruction of the old sluice-way."

The deed by Johnson to Rand & Cummings of the flume, to-

gether with the grist-mill, mill-dam, and water-power, and the reservation of a sluice-way under the grist-mill for his blacksmith-shop plot, is utterly inconsistent with any idea of his reserving, by implication or in any other way, a sluice-way which had been abandoned for more than forty years, and which if it was retained would make his grant of the flume of little value, and make it impossible to put the flume down upon the bed-rock, and if that old sluice-way was retained would make the deed meaningless as to the reservation it makes of a sluice-way under the grist-mill.

The reservation in the deed shows that the parties fixed by agreement, and put it in writing, as to what the sluice-way should be. We submit that it is good law, that when parties squarely agree how a thing shall be done, and no advantage is taken or fraud practised by either upon the other, the law will hold those parties to do as they agree. The plaintiff has no ground of complaint on account of the holding of the court as to the old sluice-way.

DOE, C. J. The trespasses alleged in these suits consist of acts done by the defendants in rebuilding and enlarging a flume. The ledge in controversy is bounded on the east by the flume, on the north and west by Ammonoosuc river, and on the south by the defendants' pulp-mill. Both parties claim certain paper title to the ledge under Richard Gookin, to whom the ledge, a grist-mill (predecessor of the defendants' pulp-mill), flume, the land under the mill and flume, and other adjoining pieces of real estate, were conveyed by Sargent in 1815 by a deed which included the whole in one tract, described as a " tract or parcel of land in Bath, where the grist-mill now stands," and further described by metes and bounds. A blacksmith-shop lot on the east side of the flume, and a secondary right to draw a certain quantity of water from the flume (which lot and right are now owned by the plaintiff), had been previously conveyed by Sargent to Bartlett & Thomas: but the ledge, the flume, and the land under the flume passed to Richard Gookin as a part of the grist-mill lot.

In August, 1829, after Richard Gookin's death, dower was assigned to his widow in an undivided half of the grist-mill lot, including the mill, flume, and ledge. The assignment, first describing her dower as an undivided half of the grist-mill, with the privileges and appurtenances to that half belonging, closes as follows,—"and we do hereby assign and set off the same to her by the metes and bounds by which her said husband held the same." On the facts stated in the referee's report, these metes and bounds were the metes and bounds of her husband's title deed, by which the ledge, grist-mill, flume, and the land under the mill and flume, were included in the grist-mill premises. Some months after the assignment of dower, "partition was made by the probate court of the real estate formerly belonging to Richard Gookin." This partition assigned to W. D. Gookin "the one

undivided half of the brick grist-mill in Bath village, with all the
privileges and appurtenances to the same belonging, to be held by
him in as full and ample manner as the same might or could have
been by the said Richard Gookin if living, with all rights of pas-
sage, and all other rights belonging or appertaining to the same,
to be held in common with Rebecca D. Gookin," the widow, "dur-
ing her life." The clause "to be held in common with Rebecca
D. Gookin during her life" tends to show that, in territorial ex-
tent, W. D. Gookin's half was not less than the other half assigned
to the widow for dower, which included the ledge and flume as a
part of the grist-mill lot. The fact that the ledge would be ex-
cluded from the partition, and left undivided, if not thus assigned
to the widow and W. D. Gookin, removes all doubt if the question
of construction is not clearly settled by the other competent evi-
dence. There is no evidence of an intention to make partition of
anything less than all the real estate of Richard Gookin, unless
the dowral reversion is an exception. The insignificance of the
ledge is shown by the absence of all specific mention of it, and by
its being included in the general description of the grist-mill prem-
ises; but there is in the case no indication of a purpose to leave it
undivided. Land, not expressly named, was divided by the parti-
tion of the mill. *Marston* v. *Stickney*, 58 N. H. 609.

From 1815 to 1838 there was on the ledge a building, originally
used for making nails, and called a nail-factory. In the reserved
case, the application of the name of this building to the ledge is
misleading. The partition not only made no use of this name, but
ignored the separate existence of both the building and the ledge,
and set them off as a part of the grist-mill, and a part worthy of
no particular mention. In title, the ledge has been a part of the
grist-mill lot. The nail building was carried off by a freshet in
1838: since that time the ledge has been occupied by nobody but
the grist-mill owners, who have made occasional use of it in clear-
ing, repairing, and rebuilding the flume; and this was the only
beneficial use that could be made of it. For the six months ending
January 31, 1838, the plaintiff let the nail building to Ladd &
Thompson; and he received rent for their use of it during that
time. With this immaterial exception, for every legal purpose of
the reserved case, the ledge has been, in actual possession as well
as in title, location, and utility, a part of the grist-mill lot.

Before October, 1835, W. D. Gookin had conveyed a saw-mill
on the west side of the river to Ross. Ross agreed to sell the saw-
mill to the plaintiff; and W. D. Gookin agreed to convey half of
the grist-mill lot to Ross. The four conveyances of October 22,
1835, were parts of one transaction, and are to be construed to-
gether. So construed they executed W. D. Gookin's agreement
to convey to Ross half of the grist-mill lot of which the ledge was
a part. One of these instruments, called by the plaintiff "a
blanket deed," was a quitclaim from W. D. Gookin to the plaintiff.

It is not necessary to inquire whether the referee's inability to find that the plaintiff paid anything for this paper is competent evidence on the question of its construction. The character of the document rebuts the ordinary presumption that favors such a construction of a deed as will give it some effect. It does not appear that the nail building, swept from the ledge by the freshet of 1838, is in existence. Its title is not now in controversy; and we need not inquire whether the plaintiff acquired any interest in it by his "blanket deed." The referee does not find, and no evidence is reported on which he could find, that the ledge was "the nail-factory privilege" mentioned in that paper. If anything passed under that description, it was neither the ledge nor any other section of the grist-mill lot, but some right of using water. If such a right, thus acquired, increases the plaintiff's interest as an owner in common with the defendants of the water-power of the flume, it does not enable him to maintain either of these actions. Whether the "blanket deed" gave the plaintiff any right of using water on the ledge or elsewhere is an immaterial question. The grantor expressly reserved his half of the grist-mill lot: by a deed which was a part of the same transaction he conveyed it to Ross: it is now owned by the defendants: and the ledge was as much a part of the grist-mill lot as the land under the mill.

The plaintiff claims the ledge by prescription. The referee, after stating the facts bearing on this claim, says, "If upon the foregoing facts it is competent to so find, the referee finds that Johnson has acquired title by adverse possession." There is no evidence of such a title in the plaintiff. He owned certain water rights on both sides of the river, and for sixteen years was accustomed to receive rent for the use of water which he chose to call his "nail-factory water." His doing this twenty years would have been no evidence of his possession of the ledge. The water was not used on the ledge; and he could get no title to the ledge by using, at some other place, some of the water of the river, and calling it his nail-factory water. The use elsewhere of a portion of the Ammonoosuc power was not possession of the ledge. His calling some of the river his nail-factory water might be evidence of his claiming the building that disappeared in 1838, and of his claiming some right to use some water somewhere. But such a claim, assented to by others, would not be actual possession of the ledge. Claim of title is a necessary accompaniment of, but not a substitute for, the possession that transfers the title of property from its owner to its possessor. There is no evidence that the plaintiff had such a possession of the ledge, except his tenants' occupation of the building: and if that were constructively expanded over the ledge, it would not sustain either of these actions. In duration, it lacked nineteen years and a half of being sufficient for the acquisition of title by prescription.

The referee found that the defendants' use of the ledge could

not be justified as an exercise of a right of necessary use under certain implied grants claimed by them; but he held that if the plaintiff and Rand & Cummings were tenants in common of the grist-mill lot, including the ledge, his conveyance of his half of the mill to them did not prevent them or their grantees from making any use of the ledge which they could rightfully have made of it before that conveyance; and that if the ledge "is a part of the grist-mill premises, it will of course follow that the grist-mill owners have only been making a legitimate use of the same." For many years before 1870 the plaintiff was one of the owners of the grist-mill lot, and he contends that when he sold his half of the mill in 1870 to Rand & Cummings, who owned the other half, he did not convey to them any title to the ledge. If this claim is well founded, he is still one of the common owners of the ledge. He owns the blacksmith-shop lot on the east side of the flume, and the right to draw a certain quantity of water from the flume after the defendants draw a certain other quantity; and if he has any interest in the ledge, it is an interest held in common with the defendants. During the last fifty years, the flume has been carried away by a freshet "about once in every seven years." In the reconstruction of it, of which the plaintiff complains, the defendants, by making it larger, and substituting stone for wood, improved the plaintiff's water right, and greatly diminished the danger of losing the flume by freshet and decay. At their own expense they put a durable structure in place of the perishable one, and widened it westward on the ledge, which was worthless for any other purpose, and was not damaged by this use of it. Upon the view of the facts and the law most favorable to the plaintiff's complaint, the defendants applied the common property to the only use to which it could be profitably put; and the application, made without damage, was a common benefit to the plaintiff and the defendants. Their community of interest in the flume and ledge would not be a bar against either of the common owners improving the flume in the only way, or the best way, in which it could be improved, and using the ledge in the only way in which it could be beneficially used. Community of interest does not prevent every improvement to which one of the common owners objects. *Cubitt* v. *Porter*, 8 B. & C. 257. The defendants are not liable in trespass for the use made of the ledge in rebuilding and widening the flume.

The plaintiff's water right in the flume is probably of small value; but it cannot on that account be excluded from consideration in ascertaining the rights of the parties in any branch of their controversy on which it has a legal bearing. For the return of water from his wheels to the river, in his enjoyment of his privilege on his blacksmith-shop lot, the plaintiff formerly had two easements in raceways running from that lot to the river, one under the grist-mill and the other under the flume; and he reserved

the former when he conveyed to Rand & Cummings half of the grist-mill "with the first right of water-power" and "a proportionate right of the flume." If the raceway under the flume had been in use when he reserved the other, it might have been argued that there was a presumption of his intent to retain the right in use at that time. But as neither of them was then in use, and neither had been used for fifteen years, no presumption arises from the contemporaneous use of the premises in favor of an implied reservation of an easement that would materially impair the apparent extent and value of his grant. In view of the condition of the blacksmith-shop lot, of which no use had been made for fifteen years, and on which during that time there had been no building, and no indication either of any intended use or of any necessity for two raceways if it should ever be used again, his grantees might well understand that as the subjection of the grist-mill to one raceway easement for the benefit of the vacant lot was expressly continued by the deed, their right to permanently rebuild the flume was not obstructed by another concerning which the deed was silent. The construction of the deed is the ascertainment of the fact of the parties' intention from competent evidence. *M. & M. R. Co.* v. *Jurey*, 111 U. S. 584, 592; *Hurd* v. *Dunsmore*, 63 N. H. 171; *Crawford* v. *Parsons*, 63 N. H. 438. In whatever doubt this fact may be left by the evidence, there is a preponderance of probability that the parties intended the grist-mill privilege should not be burdened with two raceways for the unoccupied lot, and that the one the plaintiff reserved under the mill was the only one he was to have across the grist-mill lot. The other was extinguished by the deed; and the defendants are not liable, in an action of any form, for obstructing it by the solid foundation of the new flume.

The plaintiff's three suits in trespass *qu. cl.* were tried together. In rebuilding the flume, the defendants of the third suit permanently and materially improved the plaintiff's vacant lot at their own expense; and the gratuitous improvement having been made without his consent, he is entitled to nominal damages in the third suit. We concur in the referee's opinion that this portion of his award ought not to carry costs. In the first and second suits, the defendants are entitled to judgment; and in the third they are substantially the prevailing party. In two suits, they are entitled to the usual costs, and in one, to the costs of the trial.

*Case discharged.*

BLODGETT, CARPENTER, and BINGHAM, JJ., did not sit: the others concurred.